UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

KING FOOK JEWELLERY GROUP LTD.,

Plaintiff,

-against-

JACOB & COMPANY WATCHES INC.,

Defendant.

**OPINION AND ORDER**

14 Civ. 742 (ER)

Ramos, D.J.:

King Fook Jewellery Group Ltd. ("King Fook") brought this breach-of-contract action against Jacob & Company Watches Inc. ("Jacob"), alleging that Jacob, a jewelry and watch manufacturer and designer, breached its contractual obligation to repurchase unsold products from King Fook, Jacob's exclusive retailer in Hong Kong. On July 25, 2016, the Court granted King Fook's motion for summary judgment on the issue of Jacob's liability for breach of contract, but denied King Fook's motion for summary judgment as to the amount of damages.

On June 4 and 5, 2018, the Court held a bench trial on the issue of damages. Three witnesses testified: Yee Kwan Yeung ("Yee"), King Fook's assistant general manager; Yeung Ping Leung Howard ("Yeung"), King Fook's former chairman; and Beverley Bartalis, Jacob's financial controller. The second day of the trial was held in a conference room at the office of King Fook's counsel, where the products that King Fook seeks to have Jacob repurchase were displayed.

Having considered the evidence presented at trial, the credibility of the witnesses, and the legal arguments made by counsel, the Court sets forth below its findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

## I. Findings of Fact

### A. The Parties

1. King Fook is a Hong Kong limited company that operates a business retailing jewelry, watches, and gold. Yee Decl. ¶ 3; Yeung Decl. ¶¶ 4–5.

2. Jacob was a New York corporation that made and sold luxury watches. Bartalis Decl. ¶¶ 1, 3; Joint Pretrial Statement ¶ iii, Doc. 79.

### B. The Parties' Agreements

3. On or about April 1, 2008, King Fook and Jacob entered into an Exclusive Retailer Distribution Agreement (the "2008 Agreement"), whereby King Fook was appointed the exclusive retailer in Hong Kong for certain of Jacob's products. PX-1. The 2008 Agreement provided for a term of five years, commencing on the effective date of April 1, 2008, and terminating on March 31, 2013. PX-1 ¶ 3.[2]

4. Pursuant to the 2008 Agreement, King Fook was required to, among other things, purchase a minimum amount of merchandise from Jacob each year. Specifically, King Fook was

---

[1] Citations are made to Plaintiff's Exhibits ("PX-" followed by the exhibit number); Defendant's Exhibits ("DX-" followed by the exhibit number); the Declaration of Yee Kwan Yeung, dated May 9, 2018, PX-16 ("Yee Decl."); the Declaration of Yeung Ping Leung Howard, dated May 11, 2018, PX-17 ("Yeung Decl."); the Declaration of Beverley Bartalis, dated May 11, 2018, DX-104 ("Bartalis Decl."); the transcript of the bench trial held on June 4 and 5, 2018, Docs. 98, 100 ("Tr."); and the Court's Order granting in part and denying in part King Fook's motion for summary judgment, dated July 25, 2016, Doc. 52 ("Order").

[2] Prior to the 2008 Agreement, King Fook and Jacob were parties to an exclusive retail sales agreement that was signed in March 2005 (the "2005 Agreement"). DX-1. The 2005 Agreement had a three-year term, DX-1 ¶ I, and was superseded by the 2008 Agreement, PX-1 ¶ 18.

required to purchase $1.5 million worth of products each year for the first three years and an increasing amount in the following two years. PX-1 ¶ 6(a)(v).

5. The minimum purchase requirement began on April 1, 2008. Products purchased prior to that date did not count toward the minimum. Tr. 21:11–22:6 (Yeung).

6. Upon termination, the 2008 Agreement provided that "[i]f [King Fook] has any unsold Products in inventory," King Fook must provide Jacob with a "complete and accurate certified statement" of unsold products in King Fook's inventory. PX-1 ¶ 3(c). Jacob was then required to "repurchase the Products at the amount originally paid by [King Fook] (not including any shipping, insurance and/or handling costs) less a restocking fee of 10%." *Id.*

7. The 2008 Agreement defined "Products" as "includ[ing] all watches and associated products manufactured and sold by [Jacob] and associated with the JACOB Watches," but excluding certain product lines. PX-1 ¶ 1(a).

8. The 2008 Agreement also permitted King Fook to return defective products if King Fook notified Jacob within 30 days of receipt and obtained a return authorization number. PX-1 ¶ 9(c).

9. Outside of these express return provisions, King Fook also on occasion returned older products in exchange for credit or other products. Some of these returned products were originally purchased from Jacob prior to the 2008 Agreement. Some returns did not include accompanying accessories such as watchbands, and Jacob charged King Fook for missing accessories. *See* Tr. 27:7–12 (Yeung: "[T]here could be items that have been with us for two or three years, and it's not selling. So we ask Jacob whether we can send it back to them and they can give us credit or exchange [for] more easy to sell products in our market because that product doesn't sell in our market . . . ."); Bartalis Decl. ¶ 17 ("During the course of the 2008

3

Agreement, King Fook exchanged older products that it had purchased from [Jacob] prior to entering into the 2008 Agreement. [Jacob] accepted these returns and provided King Fook with a credit for the returned merchandise."); DX-64 (2010 email discussing return of watches without alligator bands, many purchased before 2008, and requesting credit for the watches and invoices for the bands).

10. Pursuant to the 2008 Agreement, the parties agreed that "in any litigation . . . the losing party will pay the prevailing party's reasonable attorneys' fees." PX-1 ¶ 12.

11. The 2008 Agreement provided that it "shall be governed and interpreted in accordance with the laws of the State of New York." *Id.*

12. The 2008 Agreement was negotiated by Yeung (the chairman of King Fook's parent company) and Jacob Arabov (the president of Jacob). Tr. 73:5–12 (Yeung); Yeung Decl. ¶¶ 3–4; PX-1, at 10.

13. The provision obligating Jacob to repurchase unsold products was negotiated as a quid pro quo for King Fook's obligation to purchase a minimum amount of merchandise. *See* Yeung Decl. ¶ 22 ("King Fook only agreed to purchase a minimum number of watches because Jacob agreed to the repurchase obligation."); Tr. 71:19–23 (Yeung: "[Arabov said] he will impose a minimum order for us if we want to continue to have a new contract. And I say to him . . . , OK, I can have a minimum number of purchase, but [if] for some reason . . . we do not continue the contract, he will have to take back all our inventory."); Tr. 73:9–12 (Yeung: "Only when [Arabov] insist[ed] upon . . . a minimum order every year on the new contract, then I insisted that he will have to buy back all the products or else we will not continue the relationship.").[3]

---

[3] Jacob's sole witness did not provide admissible testimony concerning the negotiation of the 2008 Agreement. *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced

4

14. The 10% restocking fee deducted from Jacob's repurchase price covered the cost of handling and repackaging the products. *See* Tr. 119:10–14 (Bartalis: restocking fee is "standard practice in our business" and is "[f]or our handling of the goods, for reboxing them, for retagging them").

15. The 10% restocking fee did not cover the cost of repairing damaged products, for which Jacob could charge King Fook. *See* Tr. 119:17–20 (Bartalis: "[A returned product] would have to come in a pristine condition. If it wasn't in that condition, we would back charge them for what it would cost us to bring it back to that condition, if we took it back. Some we may not take back.").

16. On April 24, 2012, the parties executed a letter amending the 2008 Agreement ("Amendment"). PX-2. The Amendment provided that, among other things, King Fook would not renew the 2008 Agreement upon its termination on March 31, 2013; the minimum purchase requirement in paragraph 6(a)(v) of the 2008 Agreement "shall no longer be of any force or effect"; and any unsold products held by King Fook could, at King Fook's option, "be sold at whatever discounted price [King Fook] may consider appropriate from time to time." *Id.* The Amendment stated that, except insofar as it was amended, the 2008 Agreement "shall continue in full force and effect." *Id.*

### C. Termination of the 2008 Agreement

17. By letter dated March 25, 2013, King Fook wrote to Jacob: "As you know, the [2008] Agreement will terminate on March 31, 2013. Under clause 3 c) of the Agreement,

---

sufficient to support a finding that the witness has personal knowledge of the matter."); Fed. R. Evid. 802 ("Hearsay is not admissible unless [an exception applies]."); Tr. 104:14–105:11 (Bartalis: "Q. Were you at all involved in the negotiations of that agreement? A. No. . . . Q. So your testimony is based on something that someone told you about the agreement? A. Yes.").

5

[Jacob] is obliged to repurchase any unsold Products. We attach a statement of such items." PX-3.

18. On June 19, 2013, Arabov responded to the March 25, 2013 letter by email, apologizing for the delay in response and stating, "We recognize our obligation under the current agreement, and want to do what we can to help. . . . We have heavily invested in new product, management, facilities and marketing and currently it would be very difficult for us to buy back any merchandise." PX-8.

19. Jacob has refused to accept the return of King Fook's unsold products. Yeung Decl. ¶ 16.

**D.     The Unsold Products**

20. Plaintiff's Exhibit 4 lists King Fook's claimed inventory of Jacob products, as of May 9, 2018, which omits products that King Fook sold since the termination of the 2008 Agreement. Yeung Decl. ¶ 14 & Ex. C; *accord* PX-4. The report lists 179 watches and 127 accessories, at a total cost of $3,133,111.55. PX-4, at 4, 7. The exhibit indicates each item's "GR Date" (goods received date), which ranges from 10/18/2003 to 8/19/2014. PX-4, at 1, 7; Tr. 66:22–25 (Yeung).

21. King Fook could not produce for trial 176 alligator/crocodile straps due to customs restrictions. These comprised 174 straps at $148.75 each, as well as 1 strap at $150.52 (model no. ABW24T) and 1 strap at $175 (model no. ABL20). Tr. 142:7–17 (Yee); PX-4, at 5–7; Brown Decl. ¶ 7, Doc. 107. During the 2008 Agreement, the price of alligator straps was typically $148.75, and the price of rubber straps was $64.75. Tr. 170:14–19 (Yee); Tr. 180:1–4 (Bartalis).

22. Yee testified that all the watches were in good, working condition when he inspected them in Hong Kong in May 2018. Tr. 97:17–98:1, 146:18–21; Yee Decl. ¶¶ 7–8.

6

23. However, the evidence showed that some products were damaged or missing components. For instance, 18 alligator straps and 5 rubber straps had wear and tear that required their replacement. *See* Yee Decl. ¶ 9 (discussing "wear and tear in eighteen of the leather straps and five rubber straps" and need to "replace those straps").

24. Some products had defects such as stopped watches; a deficient water-resistant seal; loosened internal components; and missing components such as the battery,[4] buckle, tang (the needle on the buckle that goes through the strap), spring bar (the bar that connects the strap to the watch), or screws.[5] Tr. 146:6–14, 154:1–6, 156:13–22, 158:21–159:11, 160:5–13, 161:21–23, 162:6–21, 164:20–165:7 (Yee).

25. King Fook adduced evidence that such defects were a "small problem," "very minor," and "could be fixed"; missing components could be replaced; and no defect would be so expensive to fix that it would be inappropriate to do so. Tr. 158:23, 160:10–11, 162:12, 165:19–20, 166:1–6, 167:1–14, 173:2–4 (Yee). Jacob adduced no evidence that it could not remedy these defects and no credible evidence of the cost of such remediation.[6]

---

[4] Jacob suggests that King Fook's removing the batteries before shipping the watches to the United States rendered it impossible to determine numerous watches' functionality. The Court disagrees. Yee testified that all the watches were working when he inspected them in Hong Kong in May 2018. Tr. 146:18–21; Yee Decl. ¶¶ 7–8. Jacob submitted no contrary evidence of the watches' functionality in Hong Kong or their functionality in the United States if the batteries were replaced. All Jacob established is that they are now missing batteries.

[5] Jacob also attempted to show that a watch failed an "amplitude test" performed off the record. However, Jacob adduced no admissible evidence concerning the results or significance of the test, or even that the test was performed properly or reliably. Tr. 163:12–22 (Yee).

[6] Bartalis testified that Jacob previously repaired a Quenttin-model watch approximately two years ago. Tr. 177:21–23. She further testified that the cost of repairing the movement (the internal mechanism) of a Quenttin watch, "if that is what is wrong with it, . . . could be in excess of $5,000." Tr. 165:24–25, 177:24–178:2. Jacob showed that two of King Fook's Quenttin watches had stopped working, but did not show whether this was attributable to a particular problem with the movement or some other cause entirely. Tr. 154:5–6 (Yee). The Court does not find Bartalis's estimate—which involved a different

26. The products also did not have the boxes, polishing cloths, or warranty cards that they originally came with. Tr. 143:1–17 (Yee); Bartalis Decl. ¶ 33.

27. There were some discrepancies between King Fook's inventory report and the original invoice for certain watches. For instance, King Fook's inventory report indicated that one watch (serial no. S6400) had a 2.00 carat bezel, while the original invoice for this watch indicated that it had a 3.20 carat diamond bezel. The inventory report listed a price of $8,585, while the original invoice listed a price of $9,690. *Compare* PX-4, at 2, *with* DX-62, at KF0002785. Jacob adduced no evidence of the difference in value between the bezels or that $1,105 was an inaccurate discount.

28. One watch purchased for $84,000 (serial no. 18-18) had a GR Date of 1/30/2010 on the inventory report. However, the original invoice for this watch was dated 03/27/07. *Compare* PX-4, at 2, *with* DX-21. The Court finds that the original invoice is more reliable and that the watch was purchased on March 27, 2007.

29. 53 rubber straps ($64.75 each) had a GR Date of 7/31/2013. However, Bartalis testified, and King Fook conceded, that these straps were actually purchased before April 1, 2008, and the Court so finds. *Compare* PX-4, at 6–7, *with* Bartalis Decl. ¶ 16, *and* Pl.'s Mem. 13 n.18, Doc. 106.

---

watch with a problem that may or may not be present in King Fook's Quenttin watches—to be a reliable estimate of the cost of repairing the products in this case.

30. Jacob did not identify any products on King Fook's claimed inventory that King Fook purchased with credit from exchanged products that were originally purchased before the 2008 Agreement.[7] Tr. 111:9–17 (Bartalis).

31. The parties disputed the purpose of certain "specialty" or limited-edition watches on the inventory (model nos. JC47CHINA and MANSSDC). The trial evidence showed that these watches were bought by King Fook to be resold to the public. Tr. 29:5–14, 68:10–70:3 (Yeung); Tr. 112:7–16 (Bartalis).

## II. Conclusions of Law

32. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between King Fook and Jacob, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

33. Pursuant to its express terms, the 2008 Agreement is governed by New York law. PX-1 ¶ 12.

34. Under New York law, "[i]n order to recover from a defendant for breach of contract, a plaintiff must prove, by a preponderance of the evidence, (1) the existence of a contract between itself and that defendant; (2) performance of the plaintiff's obligations under the contract; (3) breach of the contract by that defendant; and (4) damages to the plaintiff caused by that defendant's breach." *Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 52 (2d Cir. 2011).

35. In its July 25, 2016 Order, the Court granted summary judgment to King Fook on the issue of Jacob's liability for breach of contract. Order at 22. The Court held that "no genuine

---

[7] Jacob only identified products purchased before April 1, 2008, and exchanged for credit after that date. Def.'s Mem. 24, Doc. 104. However, Jacob could not determine whether any products purchased with credit were sold to customers or remained in King Fook's inventory.

issue of material fact remains to be determined as to [Jacob]'s liability for breach of contract." *Id.* at 16. The Court further held that "[t]here is no genuine dispute that [King Fook] has been damaged by some amount as a result of [Jacob]'s failure to repurchase the unsold products." *Id.*

36. However, the Court denied summary judgment to King Fook as to the amount of damages. *Id.* at 22. Jacob was obligated to repurchase "any unsold Products in [King Fook's] inventory upon termination." PX-1 ¶ 3(c). The Court held that this provision was "ambiguous as to whether it covers . . . four categories of products outlined by [Jacob]," and "a genuine issue of material fact exists as to whether the parties intended the repurchase obligation to cover [those] categories." Order at 20–21. Those four categories were "(i) inventory that [King Fook] purchased prior to entering into the April 1, 2008 Agreement; (ii) inventory that [King Fook] purchased after April 1, 2008 with credit from the returns of products purchased prior to April 1, 2008; (iii) custom-designed watches that [Jacob] made at the request of [King Fook]'s senior personnel; or (iv) products that are damaged or otherwise not in the same saleable condition as they were when delivered to [King Fook]." *Id.* at 19. In addition, if the repurchase obligation did not cover the fourth category, the Court noted that "a material factual issue also exists as to the condition of the products." *Id.* at 21 n.15.

### A. Liability for Breach of the Repurchase Provision

37. Jacob is liable to King Fook for breaching the repurchase provision. Jacob argues that King Fook failed to provide a "complete and accurate certified statement" of unsold products and to produce all the necessary materials to be repurchased, which Jacob contends were conditions precedent to any repurchase. Jacob's argument is meritless because the Court already determined on summary judgment that Jacob is liable for breach of contract. *See id.* at 16 ("[N]o genuine issue of material fact remains to be determined as to [Jacob]'s liability for

breach of contract."). To the extent any necessary materials are missing or King Fook's claimed inventory is inaccurate, those deficiencies may be taken into account in assessing damages.

B. **Scope of the Repurchase Provision**

38. "Under New York law . . . 'a contract is to be construed in accordance with the parties' intent, which is generally discerned from the four corners of the document itself.' In construing a contract, a court should read the contract as a whole, and avoid any interpretation that would render a contractual provision without force and effect. Only when a court finds ambiguity in the parties' written agreement may it look to extrinsic evidence to discern the parties' intent." *Luitpold Pharm., Inc. v. Ed. Geistlich Söhne A.G. Für Chemische Industrie*, 784 F.3d 78, 87 (2d Cir. 2015) (citations omitted). "Extrinsic evidence includes evidence surrounding the negotiation and execution of the ambiguous terms, and the subsequent course of conduct of the parties," *Adasar Grp., Inc. v. NetCom Sols. Int'l, Inc.*, No. 01 Civ. 0279 (WHP), 2003 WL 1107670, at *7 (S.D.N.Y. Mar. 13, 2003), as well as "industry custom or practice," *Natwest USA Credit Corp. v. Alco Standard Corp.*, 858 F. Supp. 401, 413 (S.D.N.Y. 1994).

39. Because the repurchase provision of the 2008 Agreement is ambiguous, the Court looks to extrinsic evidence to discern the parties' intent. Order at 21.

1. **Products That Are Damaged or Not in Saleable Condition**

40. Jacob is obligated to repurchase damaged products and products missing accessories insofar as Jacob can reasonably restore them to saleable condition, with Jacob's repurchase price reduced by the cost of such restoration. Jacob is obligated to repurchase products regardless of the presence of packaging materials such as display boxes, polishing cloths, or warranty booklets, the replacement of which is already covered by the 10% restocking fee deducted from the repurchase price.

a. Jacob was required to repurchase "any" unsold products "at the amount originally paid by [King Fook] (not including any shipping, insurance and/or handling costs) less a restocking fee of 10%." PX-1 ¶ 3(c).

b. The 10% restocking fee covered the cost of handling and repackaging the products. *See* Tr. 119:10–14 (Bartalis: restocking fee is "standard practice in our business" and is "[f]or our handling of the goods, for reboxing them, for retagging them").

c. The 10% restocking fee did not cover the cost of repairing damaged products or replacing missing accessories. In light of the parties' course of performance, where Jacob could reasonably restore returned products to saleable condition, Jacob had to accept the products and charge King Fook for such restoration. *See* Tr. 119:17–20 (Bartalis: "[A returned product] would have to come in a pristine condition. If it wasn't in that condition, we would back charge them for what it would cost us to bring it back to that condition, if we took it back. Some we may not take back."); DX-64 (email discussing return of watches without alligator bands and requesting credit for the watches and invoices for the bands).[8]

---

[8] Jacob argues that it need not repurchase damaged or altered products under the "perfect tender" rule, which provides that a "buyer" may reject goods that "fail in any respect to conform to the contract." N.Y. U.C.C. Law § 2-601. King Fook responds that Jacob is not the buyer (King Fook is), and that the repurchase provision denotes a "sale or return" under the U.C.C., which is a transaction where "goods . . . delivered primarily for resale" "may be returned by the buyer even though they conform to the contract." *Id.* § 2-326(1)(b). The Court agrees that the repurchase provision is more akin to a "sale or return" under section 2-326(1)(b). Although neither party addresses this, the Court notes that the following U.C.C. section provides that "[u]nder a sale or return unless otherwise agreed . . . the option to return extends to the whole or any commercial unit of the goods while in substantially their original condition . . . and . . . the return is at the buyer's risk and expense." *Id.* § 2-327(2). Because "the risk of loss is on the buyer . . . the seller is entitled to a money allowance or monetary damages if the buyer returns damaged goods." 3A David Frisch, *Lawrence's Anderson on the Uniform Commercial Code* § 2-327:31 (3d ed. 2018). This

12

41. Jacob is entitled to a deduction of $26,208.02 for 176 alligator straps that King Fook did not produce for trial due to customs restrictions: 174 such straps at $148.75 each, as well as 1 strap at $150.52 (model no. ABW24T) and 1 strap at $175 (model no. ABL20). Tr. 142:7–17 (Yee); PX-4, at 5–7; Brown Decl. ¶ 7, Doc. 107.

    a. During the 2008 Agreement, the price of alligator straps was typically $148.75, and the price of rubber straps was $64.75. Tr. 170:14–19 (Yee); Tr. 180:1–4 (Bartalis).[9]

42. Jacob is entitled to a deduction of $323.75 to replace 5 rubber straps ($64.75 each) that were damaged.

    a. 5 rubber straps had wear and tear that required their replacement. *See* Yee Decl. ¶ 9 (discussing "wear and tear in . . . five rubber straps" and need to "replace those straps").[10]

43. Jacob is not entitled to a deduction for any other watches or accessories that it claims were malfunctioning, missing components, or otherwise damaged, because there is no credible evidence that Jacob could not restore them to saleable condition or that such restoration would cost any nontrivial amount of money.

    a. Jacob showed that several products had defects such as stopped watches; a deficient water-resistant seal; loosened internal components; and missing

---

section provides further support that King Fook may return damaged products so long as they are in substantially original condition and King Fook pays the cost of reasonable repairs.

[9] Although Yee testified that in 2018 alligator straps costed $250 and rubber straps costed $200, the Court finds that the price during the 2008 Agreement is the more appropriate measure of damage because the breach occurred at the end of the 2008 Agreement in 2013, not 2018. Tr. 170:7–13.

[10] Although 18 alligator straps also had wear and tear, these straps are already deducted because they were not produced for trial.

| | |
|---|---|
| | components such as the battery, buckle, tang, spring bar, or screws. Tr. 146:6–14, 154:1–6, 156:13–22, 158:21–159:11, 160:5–13, 161:21–23, 162:6–21, 164:20–165:7 (Yee). |
| b. | However, Jacob adduced no evidence that it could not repair these defects and no credible evidence of the cost of such repair. On the contrary, King Fook adduced evidence that such defects were a "small problem," "very minor," and "could be fixed"; missing components could be replaced; and no defect would be unreasonably expensive to fix. Tr. 158:23, 160:10–11, 162:12, 165:19–20, 166:1–6, 167:1–14, 173:2–4 (Yee). |
| c. | "A non-breaching party 'is entitled, as a matter of law, to recover market value damages to the extent that they can be proven with reasonable certainty.' Where, however, the non-breaching party has proven the *fact* of damages by a preponderance of the evidence, 'the burden of uncertainty as to the amount of damage is upon the wrongdoer.' Doubts are generally resolved against the party in breach. Therefore, a plaintiff need only show a 'stable foundation for a reasonable estimate' of the damages incurred as a result of the breach. At that point, the burden of any uncertainty as to the amount of damages is on the breaching party." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 141 (2d Cir. 2016) (citations omitted). |
| d. | King Fook has established a reasonable estimate for its damages by pointing to the amount that it originally paid for the products less a 10% restocking fee, pursuant to the 2008 Agreement. PX-1 ¶ 3(c). Such |

damages may be reduced by the cost of restoring the products to saleable condition. However, Jacob has adduced no credible evidence of the cost of such restoration, which remains uncertain. Jacob, as the breaching party, must bear the burden of that uncertainty. Thus, Jacob is not entitled to any reduction for those costs.

44. Jacob is not entitled to a deduction for a discrepancy between King Fook's inventory report and the original invoice concerning the type of bezel on a watch (serial no. S6400), because King Fook has discounted that watch's price and there is no evidence that the discount is inaccurate.[11]

    a. King Fook's inventory report indicated that a watch (serial no. S6400) had a 2.00 carat bezel, while the original invoice for this watch indicated that it had a 3.20 carat diamond bezel. The inventory report listed a price of $8,585, which was discounted from the original invoice price of $9,690. *Compare* PX-4, at 2, *with* DX-62, at KF0002785.

    b. Although Jacob is entitled to a deduction for the difference in cost between the original and current bezel, Jacob adduced no evidence that the deduction of $1,105 is inaccurate.

---

[11] Jacob claims several other discrepancies between King Fook's inventory report and the original invoices. As will be explained below, one watch (serial no. 18-18) will be deducted because the correct purchase date is before April 1, 2008, and thus it is not subject to the repurchase requirement. The other claimed discrepancies involve products that are already indicated on the inventory report as purchased before April 1, 2008, and thus will be deducted regardless of any other discrepancy. *See* PX-4, at 1 (serial nos. 0151-1800, A1818, S7652, S5789, S3272, A2798, A1606, A553, B0607, SJ0198).

c. Thus, King Fook has established a reasonable estimate for its damages for this watch, and any uncertainty in the discount for the bezel must be borne by Jacob.

**2. Products Purchased Prior to the 2008 Agreement**

45. Jacob is not obligated to repurchase products that King Fook bought prior to the effective date of the 2008 Agreement, April 1, 2008.

    a. The provision obligating Jacob to repurchase unsold products was negotiated as a quid pro quo for King Fook's obligation to purchase a minimum amount of merchandise. *See* Yeung Decl. ¶ 22 ("King Fook only agreed to purchase a minimum number of watches because Jacob agreed to the repurchase obligation."); Tr. 71:19–23 (Yeung: "[Arabov said] he will impose a minimum order for us if we want to continue to have a new contract. And I say to him . . . , OK, I can have a minimum number of purchase, but [if] for some reason . . . we do not continue the contract, he will have to take back all our inventory."); Tr. 73:9–12 (Yeung: "Only when [Arabov] insist[ed] upon . . . a minimum order every year on the new contract, then I insisted that he will have to buy back all the products or else we will not continue the relationship.").

    b. Products purchased prior to April 1, 2008, did not count toward King Fook's minimum. Tr. 21:11–22:6 (Yeung).

    c. Therefore, the parties could reasonably expect that the repurchase requirement applied only to products purchased after April 1, 2008, under the minimum purchase requirement.

46. Thus, Jacob is not obligated to repurchase $723,975.58 in merchandise that King Fook bought before April 1, 2008. This figure includes:

    a. Any watches and accessories with a GR Date before 4/1/2008 on Plaintiff's Exhibit 4 (totaling $636,543.83), PX-4, at 1–2, 4–5;

    b. 1 watch for $84,000 (serial no. 18-18) with an erroneous GR Date that was actually purchased on March 27, 2007, *compare* PX-4, at 2, *with* DX-21; and

    c. 53 rubber straps ($64.75 each) with an erroneous GR Date that were actually purchased before April 1, 2008, *compare* PX-4, at 6–7, *with* Bartalis Decl. ¶ 16.

47. Likewise, Jacob is not obligated to repurchase merchandise that King Fook bought after March 31, 2013, when the 2008 Agreement terminated. Jacob thus need not repurchase one watchband bought for $90 in 2014 (model no. EPIC2-BAND).[12] PX-4, at 7.

### 3. Products Purchased with Credit from Exchanged Pre-2008 Products

48. Jacob argues that it is not obligated to repurchase products that King Fook bought with credit from exchanged products originally purchased before April 1, 2008. However, even assuming that is the case, Jacob has not identified any such products on King Fook's inventory report. Tr. 111:9–17 (Bartalis). Accordingly, Jacob is not entitled to any deduction for exchanged products.

---

[12] Another alligator band purchased in 2014 for $175 (model no. ABL20) is already deducted because King Fook could not produce it for trial.

### 4. Specialty Watches

49. Jacob argues that it is not obligated to repurchase "specialty" or limited-edition watches made exclusively for or at the request of King Fook (allegedly model nos. JC47CHINA and MANSSDC). However, there is nothing indicating that such watches were excluded from Jacob's obligation to repurchase "any" unsold products. PX-1 ¶ 3(c).[13] Accordingly, Jacob is not entitled to any deduction for these watches.[14]

### C. Attorneys' Fees

50. The 2008 Agreement provides that "in any litigation . . . the losing party will pay the prevailing party's reasonable attorneys' fees." PX-1 ¶ 12. As the prevailing party, King Fook is entitled to reasonable attorneys' fees.

51. King Fook has submitted invoices to support its request for $542,828.50 in attorneys' fees. PX-14; Brown Decl. Exs. B–D, Doc. 107; Brown Decl. Ex. A, Doc. 110. However, at this time, the Court cannot determine whether the requested attorneys' fees are "reasonable" pursuant to the 2008 Agreement, because the descriptions of services are redacted.

52. Accordingly, the Court will refer King Fook's request for attorneys' fees to Magistrate Judge James L. Cott for an inquest.

---

[13] Indeed, another contract provision specifically excluded "[l]imited editions" of products from the general pricing terms under which King Fook purchased merchandise, indicating that the parties knew how to exclude limited-edition watches. PX-1 ¶ 8(e). If the parties had intended to also exclude limited-edition watches from Jacob's repurchase obligation, they would have done so expressly.

[14] Jacob originally argued that these watches were custom-made for King Fook executives rather than for retail sale. Bartalis Decl. ¶ 20. However, the trial evidence showed that these watches were bought by King Fook to be resold to the public. Tr. 29:5–14, 68:10–70:3 (Yeung); Tr. 112:7–16 (Bartalis). Accordingly, there is no basis to exclude these watches.

## III. Conclusion

For the reasons set forth above, Jacob is liable to King Fook in the amount of **$2,144,262.78**. This figure represents King Fook's claimed inventory valued at $3,133,111.55, reduced by:

- $26,208.02 for alligator straps that were not produced,
- $323.75 for damaged rubbers straps,
- $723,975.58 for merchandise purchased before April 1, 2008, and
- $90 for merchandise purchased after March 31, 2013, the total of which
- less a 10% restocking fee.

In addition, Jacob is liable to King Fook for statutory interest,[15] costs, and attorneys' fees in an amount to be determined in an inquest before Magistrate Judge Cott. The Clerk of the Court is respectfully directed to enter judgment accordingly.

It is SO ORDERED.

Dated: March 13, 2019
New York, New York

Edgardo Ramos, U.S.D.J.

---

[15] Jacob argues that, notwithstanding King Fook's claim for damages, the action seeks specific performance, which is equitable in nature. Jacob urges that, in light of the equitable nature, interest may be awarded at the Court's discretion under N.Y. C.P.L.R. § 5001(a), rather than at the mandatory rate of 9% under N.Y. C.P.L.R. § 5004. "Even if the award were equitable in nature, this Court would exercise its discretion to set the rate of prejudgment interest at 9% per annum. Under New York law, a rate of 9% is a presumptively fair and reasonable attempt to estimate interest." *City of New York v. Nat'l R.R. Passenger Corp.*, No. 06 Civ. 793 (SLT) (RER), 2009 WL 483343, at *3 (E.D.N.Y. Feb. 25, 2009), *aff'd*, 373 F. App'x 84 (2d Cir. 2010).